GALVESTON, H. & S. A. RY. CO. v. SCHELLING et al. (No. 232.)

(Court of Civil Appeals of Texas. Beaumont. Oct. 27, 1917.)

1. EMINENT DOMAIN ☞202(1)—ADMISSIBILITY OF EVIDENCE — INTENDED USE OF PROPERTY.

In a suit to condemn a strip 18 feet wide adjoining the right of way of a railroad already in operation, from a tract of 36 acres, evidence that the owners intended later to use such tract as a homestead was inadmissible, it being rented at the time of the suit.

2. EMINENT DOMAIN ☞202(1)—ADMISSIBILITY OF EVIDENCE — INTENDED USE OF PROPERTY.

Evidence that such tract was formerly the homestead of the owners' father, and that the owners were born and raised there, was inadmissible, as it could serve no purpose except to appeal to the sympathy of the jury.

3. EMINENT DOMAIN ☞262(5) — APPEAL — HARMLESS ERROR.

The admission of evidence that the tract was formerly the family homestead, that the owners were born and raised there, and that they intended later to use it as a homestead was prejudicial, where the damages awarded for the land not taken were apparently excessive.

4. EVIDENCE ☞543½—OPINION EVIDENCE—QUALIFICATIONS OF EXPERTS.

In a suit to condemn a strip constituting part of a larger tract, a farmer living a mile and a half from the property, who did not pretend to be a real estate expert, and had not bought or sold land in that neighborhood except on one occasion about six years before when he bought land and sold it again, was not qualified to testify as to the damage to the land not taken from the taking of such strip.

5. EVIDENCE ☞543½—OPINION EVIDENCE—QUALIFICATIONS OF EXPERTS.

In such suit the proprietor of a beer joint and amusement park, who was not a real estate expert, but who testified that he bought the land used as a park between four and five years ago, that he knew the value of lands in the neighborhood and knew of sales that had been made, and had always lived in the neighborhood and heard sales discussed and prices offered, was not qualified to testify as to the damage to the land not taken.

6. EMINENT DOMAIN ☞150—COMPENSATION—EXCESSIVE DAMAGES.

In a suit to condemn a strip of land 17 or 18 feet wide and about 1,000 feet long adjoining the right of way of a railroad in operation and constituting part of a tract of 36 acres, an award of $900 as damages to the balance of the tract, in addition to an award for the land taken of which no complaint was made, was excessive so as to indicate passion or prejudice.

Appeal from Harris County Court; Clark C. Wren, Judge.

Condemnation suit by the Galveston, Harrisburg & San Antonio Railway Company against August Schelling and others. From the judgment, plaintiff appeals. Reversed and remanded.

Baker, Botts, Parker & Garwood and Lane, Wolters & Story, all of Houston, for appellant. J. V. Meek, of Houston, for appellees.

BROOKE, J. This is a suit instituted by the Galveston, Harrisburg & San Antonio

---

Railway Company against August Schelling, Mrs. F. H. Schelling, Ernest G. Schelling, Henry Schelling, Lena Schelling Yantz and husband, H. A. Yantz, to condemn a certain strip of land 1,069.6 feet long and approximately from 17 to 18 feet wide, containing .44 of an acre, and lying adjacent to this plaintiff's right of way between Harrisburg and Stella, and belonging to the parties above named. A trial of the case by jury resulted in a judgment in favor of plaintiff for the land upon payment of $220 as the value of the land taken, and $900 damages to the balance of the tract. Plaintiff's petition is in the usual form. Plaintiff duly made motion for a new trial, and thereafter filed an amended motion, which was by the court overruled, to which plaintiff duly excepted and gave notice of appeal to this court, and thereafter duly perfected the appeal as required by law. As all of the assignments of error in this case are based upon the ruling of the court on admission of evidence, we do not deem it necessary to set forth any further statement of the case.

Inasmuch as the first, second, third, and fourth assignments relate, practically, to the same matter, they will be considered together in this brief. These assignments are as follows:

"(1) The court erred in admitting in evidence over the objection of plaintiff the testimony of the defendants August Schelling, H. F. Schelling, and Ernest G. Schelling to the effect that they intended using the piece of property in question as a home, as is shown by bill of exception No. 1.

"(2) The court erred in admitting in evidence, over the objection of plaintiff, the testimony of August Schelling, Ernest G. Schelling, and H. F. Schelling to the effect that they were born and raised on this place, and for what use the property had been put to during that time, for the reason that the property was not then being used as a home, but was rented, and had not been used as a home for several years prior to the time of the trial, as is fully shown by bill of exception No. 4.

"(3) The court erred in permitting, over the objection of plaintiff, the witness Bob Tuffly to testify as to how long the property in question had been occupied as a home, for the reason that the same was not occupied as a home at the time of the trial, nor had been for several years, but the same was rented, said evidence being wholly immaterial and prejudicial, as is more fully shown by bill of exception No. 3.

"(4) The court erred in refusing to strike out all of the evidence that the property was and had been the homestead of defendants, because the undisputed evidence showed that it was not then being used as a homestead, but was being rented, as is fully shown by bill of exception No. 2."

The propositions presented under these assignments are:

"(a) The undisputed evidence having shown that the defendants August Schelling, Ernest G. Schelling, and H. F. Schelling did not then live on the land, and that they had not lived on the land for some 15 or 16 years, and there being no showing made that they had any plans for the immediate future, or any definite time in the future to use the land as a home, the court erred in admitting the testimony of their alleged intention to use the property as a home.

"(b) The undisputed evidence having disclosed that the defendants August Schelling et al. did not then live on the land, and had not occupied it as a homestead for a number of years, their testimony that they were reared on this land and had occupied it with their father and mother as a home until they were grown was immaterial, and in its nature highly prejudicial, and the court erred in admitting it over appellant's objections.

"(c) The undisputed evidence having disclosed that the defendants August Schelling et al. did not then live on the land, and had not lived on the land for a number of years, the testimony of the witness Bob Tuffly that they were reared on this land and had occupied it with their father and mother for a number of years was immaterial, and in its nature highly prejudicial, and the court erred in admitting it over appellant's objection.

"(d) The undisputed evidence having developed the fact that defendants did not then live on the land in controversy, any evidence of a former occupancy of the property as a home was immaterial, and in its nature highly prejudicial, and the court should have sustained appellant's motion to strike out this testimony, given by various witnesses concerning the fact that the Schellings had used the property for a number of years as a homestead."

It will not be necessary, in considering these assignments, to set out at length the testimony of the various parties, about the admission of whose testimony objection is made, and which objection was by the court overruled, but it will be essential that in some respects the testimony of these parties showing, in our opinion, what largely influenced them, and which, it might be said, somewhat influenced the jury, was the fact testified to concerning the former place of residence of the Schellings being their former home, and to which, necessarily, they were more or less attached.

It is well to remember that in reading this record this court had in mind, among other things, the fact that for perhaps 50 years a railroad track had been in operation within 17 or 18 feet of the tract now sought to be condemned; that the testimony is undisputed by all the witnesses that over this railroad track there were operated, at the time in question, as many as 27 trains a day. It is, perhaps, also well that it should be read with the fact in mind that quite a number of people living near there at that time were about to sue the railroad company, and perhaps some of them had sued the railroad company for a large amount of alleged injuries, owing to the fact that the trains were operated over the road to such an extent that the noise of operation interfered with a great many of the people, about which they were largely complaining, and, as has been said, about which at least some of them were now pursuing or about to pursue the matter of alleged damage to their comfort, being near the railroad, on account of said extensive operation of trains over the same.

As we have said, not an extended, but a short, résumé of the testimony of the witnesses will indicate the controlling apparent interest which actuated them in the testi

mony as presented to the court upon the trial below.

T. J. Collins testified:

"I have been in Harrisburg 49 years. I knew the place from the time Mr. Schelling moved there till he died. I knew him before he moved there; before he married. As a whole, that Schelling tract ought to be sold for $500 or $600 an acre, $500 anyway, as a whole. That including everything. The front part of that tract, the nearest to the railroad or the county road—that's a very hard question to say what that land would be worth, because I consider it ruins the market value half when you put two tracks in there. I unfortunately live down there where there's two tracks now; it damages half the value of the property with two tracks the way the railroads run in there and blow the whistle, that is, for home purposes; for other propositions it would be all right, but not for home propositions. I own 300 acres below there, right in close to it. I have sold land all around it for years; I used to own the Street place, the place across from this, and lots of other stuff."

With reference to drainage he says:

"The Ross land is about the same kind of land as this Schelling land, only the Schelling land has a flat next to the railroad; where that ravine drains down there used to be a gulley, until the railroad fixed it up three or four feet high until it couldn't get through. I believe they cut a ditch there the last three or four years, but old Schelling didn't seem to have any trouble getting rid of that water. There is a low flat running right down in there next to the railroad. Down in that flat couldn't have been in cultivation. All from the edge of the timber out, it was in cultivation for years; all from the edge of the timber out was always in cultivation. I have known where the Schelling home is for years. I suppose that is 150 to 200 feet from the railroad, maybe 300 feet, or 400 feet; it is 300 feet anyway. I don't think it is as far as 600 feet, it may be 400. I don't think it is over 700 feet; it's been a long time since I was up there; I shouldn't think it was far but I have seen Schelling cultivate right up to the railroad from the edge of the timber out for years. I haven't been by there lately. I used to own the Street property right up adjoining it for years, sold it to Street myself, 20 years ago; 15 or 20 years ago. I reckon it is worth more now than it was; the way he talks you would think it was, if you ask him what it's worth. Mr. Street paid me $20 an acre for it. I only asked $50. George McLelland was with him and they holloed pretty loud. * * * I think that strip 18 feet wide and 1,000 feet long right next to the railroad is easily worth $1,000, because it depreciates the value of the other property. If it was mine. I wouldn't want to do it. If you were down there and get as much of it as I do, you would think there's 40. I am down there about 400 yards from the track. I am 300 yards exactly from the track and you would think you were about 10 the way those mountain engines blow down there, at all times of the night. I told the headman of the Southern Pacific, I called him up and told him, I thought I lost all my hair and teeth by that. I am not suing them right now. They are suing me. You are suing me to take my land away from me that I worked in the hayfield on for 40 years. My boy, after they killed his cattle, put the fence within two feet of the railroad ties, and they come down there at night with four or five cops and mashed it down, and then they brought suit against me. I never fenced it, never thought of doing it, but the boy fenced it up within two feet of it, because they were killing his stuff and wouldn't pay for it. I have not brought suit against the railroad companies for damages on account of that noise; one of my boys have; not me. I have not authorized Judge Tod to bring the suit for me. I have got two boys there that's in that fight. I haven't employed Lovejoy & Ewing to bring the suit, but I am going to employ them. I am going to employ them and I am going to go after the railroad for damages for the trouble they gave me. I haven't employed Judge Tod, that's my son, T. J. Collins, Jr., not me. I am going to get Lovejoy & Ewing. The right of way suit is the suit that is suing me and my son House Collins and T. J. Collins, Jr., the three of them, but the Southern Pacific is suing us three; not me; I never brought any suit; neither one; one of the boys brought it. The Southern Pacific brought the suit to condemn the property and take the right of way from us that we had for 40 years. They abandoned that property years ago. They pulled up part of the track. I can produce the man that did it. I got Judge Tod to write to Governor Hogg and they put the track back since and didn't run a train over it for nearly a year. That is the main track, running out, that they are trying to take away from me now. They took up all that track, but I am the cause of it being there to-day. I can produce the man. He is right here in town now. The first one that came in there after they put the engines on that track. They started to take up that track, they did take a big lot of it; they took up that spur that run across from the yard and put it back and they took it all up down to about the bayou. I think there was 200 men fighting one another. The Southern Pacific and the International & Great Northern were both trying to get it. They run a barge in there and just saved the Southern Pacific's time, or the International & Great Northern would have got it. There was 200 men fighting one another down there on that right of way near the bayou. My recollection is there are about 50 acres in the Schelling tract. I don't recollect; it's been a long time. The entire tract is worth $500 an acre. The strip of land is worth $1,000 or double what one acre of the other land is worth. I think it impaired its value more than that."

A. Yantz, the next witness for defendant, testified:

"I am in the park business. I have the park there. I have bought and sold lands myself. Thirty years ago I bought that park and then the city came too close to me and then about 20 years ago, 18 years ago, I bought another place, and now I am on the track. I bought this present place out there near Schellings four years ago. I did not marry one of the Schellings. I am not a brother-in-law of the Schellings or related to them. I bought this last tract between four and five years ago. I bought only four acres. I would have bought it all, but I couldn't get it. I said I would buy the whole 13 acres but I couldn't get it. Mr. Hamilton, the brewery man, said he could speculate with his own land, four acres was enough for me, so I only got four acres there. I know the value of lands in that neighborhood. I know of all the sales that's been made right there. I have always lived in that neighborhood. I have heard the sales discussed there in that neighborhood; heard prices offered and seen people refuse. I feel able to give this court and this jury my opinion as to the value. In my opinion it is worth $600 per acre. The track runs 75 feet from my land. There's a county road between me and the track. I am on the off side of the track. Schelling is on one side and I am on the other side of the track. I know where they proposed to take this 18 feet off down there. In my judgment, if those 18 feet are taken off there for railroad purposes, it will injure the balance of the tract of land for homestead purposes; lessen its value. In my judgment to take off this 18-foot strip and devote it to railroad purposes and uses or any purposes that they see fit to use it, that will decrease the value

of the balance of the property over half. When they put a double track on there. I have sued the railroad myself and no dead man cannot even live there; they wake him up; that's the honest truth. It is no more residence property forever; mine isn't; I must leave there; this is no story. This Schelling land along next to the railroad is a desirable place for one to live; they built a farm and they are healthy people and they are nice boys, that been raised on the land; that's a nice piece of ground. That next to the railroad is just as good as that back part of that 30-acre tract where they were born and raised. Mr. Collins knows how far that house is from the railroad; I haven't measured it. It's a little bit more than 300 feet; 300 to 400, I think; it could be easily stepped off and find out. My idea of the distance from that house to the railroad is about 400, I judge between 300 and 400, I couldn't tell exactly. I am just as correct in this distance as I am in estimating the value of this land. H. A. Yantz is my son. He married one of the Schellings, Miss Lena Schelling. I believe my son is a party to this suit; I didn't pay much attention to that. When that double track is built, that will decrease that property in half. The track is injured that property right now; some other properties too. Of course if they put some more trains on it that will be worse. I am suing the railroad company out there. I am going to dismiss that and sue for $14,000, so soon as possible. That is because you want to condemn Schelling's land, that makes it so much worse. I am going to sue for $10,000 more; that is no story; you will find that out, too. I used to be friendly disposed toward the railroad, a little bit; when I get too old that I shall leave my property and move somewhere else, then I can't live no more there; the whole night I can't sleep. The running of those trains does not interfere with the conduct of my store there; just that sleeping business; I must be the whole night through awake. I don't want to be disturbed; 26 or 27 trains there with the whistles. I have no boarding house or hotel there. It is a park; just a little open field. I run that all night. As to whether it is a good thing for my business to keep my customers awake, why I attend to that."

George Kuhlman, witness for defendant, testified:

"I live on Brays bayou. I have lived in that neighborhood pretty near all my life, with the exception of two or three years that I was away. I am 68 years old. I am acquainted with the Schelling land that is in dispute here, and have been ever since I have been able to paddle over it when I was a boy; that used to be our hunting grounds. That place has been improved and occupied as a home for some time, since '75, somewhere along in there, '80 or '85, I reckon; I don't know the year; the south side of Shipman's Island, we used to call it; the ford used to be there. That's across the bayou. Old man Schelling died there; he raised his family there. I have not bought and sold land out there in that neighborhood. I have not known of sales; not much has been transferred to my knowing lately. Some years ago I heard of offers for land, trading and trafficking and the prices fixed for land, but not now in the last three or five years. I own lands there myself. I don't see how I could know the reasonable, fair value of the Schelling land. There is a nice graveled road in front of this land. That adds to the value of country lands; that same road runs in front of my door; past my door. It seems to me that the building of nice graveled roads by the county enhances the value of lands. That Schelling land is fine land to be tilled or farmed; most of it; down in the wooded part, there's a little sluice, a few acres west of mine, that runs through one corner. During the old gentlemen's lifetime, he cultivated that

place. These boys and the older boys were raised there. One corner of the land down there next to the railroad is low and flat; but not all of it. There is 150 yards of it to my estimation that is low and flat; something like that. I know how far the Schelling house is from the railroad. I haven't measured it, but I judge it to be a block and a half or two blocks. * * * It might be about 500 feet. I have had no occasion to measure it. I haven't passed that land lately; I did in the spring; there's generally somebody on there cultivating it. I do not remember how many acres there are in the tract. The whole south or west end of that land has been cultivated lately; south I call it; it's all been in cultivation. None of the Schellings live there now to my knowledge. Somebody lives on the tract. I haven't been there now in a week or two to see. I think it's been cultivated, all that's in fence, for a couple of years. In the lower part towards Harrisburg, or north part of it I call it, is timber and hasn't been cultivated. There is not just about one-half of that tract covered with timber; I wouldn't think, not in the length of it, how it lies; it might be wider at this end; would make the timber cover half, maybe about two-thirds, of it cultivated and one-third in woods. The land next to the county road ought to be more valuable than back in there where the house is. The railroad is first and then the county road. The railroad runs with the county road and that homestead piece fenced all the way up and the railroad between. If I see right, it cuts Schelling's piece of land off that he bought next to the railroad on this side; this east side is where his home is and that county road runs between both of them where it goes and the rest of it is on the east side; on the sun-rising side. It would be on the right as you leave Harrisburg and go west."

Bob Tuffly, witness for defendants, testified:

"I live a half a mile south of Brays bayou; about a mile and a half southwest from the Schelling tract. I have been living in that neighborhood practically all my life. I am now 58. I am acquainted with the Schelling tract. I have known them ever since I have been there. I guess I have known them some 45 or 50 years. I have been over this land frequently in my lifetime. I guess it has been used as a home by the Schellings some 40 or 45 years. It was cultivated at that time. I have not bought and sold any lands in that neighborhood. I have heard of some sales and the prices asked, the offers made and the prices refused, and so forth; I feel that I know the value of lands in that neighborhood. The sale close to me was along about three years ago, I guess. The property that was sold and my property was about the same distance from the Schelling property. My business is farmer. I have never engaged in the real estate business. I am not an expert in real estate values. I do not make any pretense of being an expert in real estate values. I have bought and sold land for a business. I guess it must be some six years ago. I bought 640 acres about six years ago, might have been seven years ago, and sold it again. That was the extent of my buying and selling. I know of the sales that have been made in that neighborhood. I have heard of offers made and offers refused. I think I am posted and know the values of lands about my neighborhood. I profess I think I know the values of lands in Mr. Schelling's neighborhood. I know what it ought to be worth. I do know what it is actually worth by judging it by Brookline. Brookline is a townsite about 200 yards from the Schelling property. It now has a big school down there and it is on the interurban. The Schelling land is worth $600 an acre; I think they have 50 acres there. I mean on both sides of the road. That town of

Brookline is about 200 yards away from the Schelling property and before it was a town it was acreage like Schelling's. It was an old pear orchard. I have known that neighborhood all my life. In the country a mile and a half is considered the same neighborhood. In my judgment, if they take off 18 feet off the front beginning down where Mr. Street's line joins the Schelling tract, for a thousand and some odd feet, it will damage the balance of that tract. I think it would make their land one-half less valuable. It makes no difference what they put along there in front of Mr. Schelling's property; I heard them frequently say they wanted it for their home. My opinion is not based on what the Schellings told me they wanted the property for. As far as what they wanted it for, nobody hasn't told me, but I know what they (the railroad) wanted it for, because I see them putting the switches down. My opinion as to value is not based on what the Schellings told me they wanted to use the property they owned out there for. I hadn't thought of that at all. I just naturally think by cutting off the front of that property, it will damage it one-half; let them take one or two acres off of it. I mean to testify that the mere cutting off of 18 feet off of the front end of this tract here known as the Schelling tract down to the line here will damage that property one-half. That is my testimony. Certainly, I mean that the putting of the railroad in there would damage that one-half, and not simply the taking of this 18 feet. If they cut off 18 feet off of a piece of land that you have got and take your front, that will completely very nearly ruin it. After that 18 feet is taken the front which remains is just the same. I understand that 18 feet is a comparatively small portion as to this whole length, too. It is not a fact that I am basing the damage to that whole tract by the fact that the railroad is put in there. I am not studying about what they were going to do with it or anything about it, but if they take off 18 feet off of a man's front— the taking of this 18 feet off of the front of the property like it is proposed to do, I believe, will affect the ingress and egress to and from the property. It will do it because it makes the front that much shorter. I don't know as I understand what you mean by the words ingress and egress. The 'cutting off of this 18 feet will affect both the going in and coming out of this property, they will have to go further from the railroad track to get to theirs; 18 feet further. Just a question of driving 18 feet. In my opinion, that damages the property one-half. I do not know of any property that sold for $600 an acre adjacent to Schelling's property. The property that was sold is there by me, where I live, a mile and a half northwest of Schelling's property. The man that bought it runs a dairy."

J. N. Whitaker, witness for defendants, testified:

"At present, I reside on the Schilling property or place. I have resided there about 8 months. Since I have been out there, I have not cultivated any land. I have been working in town and using it as a residence. It is something over a half a mile from the interurban station. From the corner of the Schilling property where they start to condemn, from the telephone road over to Mr. Yantz's corner is something like 200 feet, between 200 and 300 feet. I judge it to be; I never measured it. Yantz's corner is right at Brookline; just across the street. There is one track there now. The greatest number of trains I have seen pass over this track in one day is 27. I was there prior to the day that a ditch that the railroad claims to have put there was constructed. I can't say that the drainage now since they covered up the old ditch and put this one is any

better than it was before that, if anything it is not as good. * * * I know where the tract of land the railroad is seeking to condemn is. I don't just know how far the timber extends up at the west side of the railroad track. It does not go all the way up to that crossing. The timber does not extend all the way along that ditch that was dug there. It doesn't extend anywhere along there where they dug the ditch. This timber does not extend all the way across the front of Mr. Schelling's property. It extends about one-third of it. I live in the Schelling house. I never measured how far it is from the railroad to the house, but I judge it is between 500 and 600 feet. The trains when passing by there shakes that house. Every evening wakes me up by the shaking of the house and the rattling of the windows. There is usually about six or seven or eight trains pass there. One occasion last fall when there was lots of freight going by, 27 trains went one day. I counted them myself. I wasn't there but I was in Brookline, 50 yards of the track, working on the house. That was during the day and night. About 17 or 18 passed during the daytime; I wouldn't be positive. I kept count of those trains because one of the men that was working with me spoke about the number of trains that passed and from that on we started to count them. His name was George Benjamin. I couldn't tell you where he is now; he is about Houston some place; he is a carpenter, working there with me; I haven't seen him lately. I didn't mark it down on anything."

August Schelling, defendant, testified:

"I am one of the defendants in this suit. My next birthday, I will be 46 years old. My father's name was E. G. Schelling, Sr. My father moved on this place after I was born. As near as I can get at it, I must have been about 10 or 11 years of age when I moved on there, because I remember, like a kid will. I remember moving on it; going out with father when he was having a new house built on the place. I stayed on there until I was about 22 or 23 years old. Then I come to town and I am working for Bering & Cortez. I have been with Bering & Cortez, now, last October, 15 years. There's one sister and two brothers that have an interest in the place now. We all own the property. I have one sister-in-law; she holds her rights. She did not sell her rights; she still owns her interest. That is Fred's widow. Fred is dead. During the time from 10 years old up till now, the property has been used for truck gardening and farming. When we first moved out there, there was Fred and Ernest and myself; we were the three oldest boys; Fred and Ernest being older than me. We moved from Harrisburg out there, then we run a truck garden; what we call a truck garden is vegetables, the same as hucksters have now. Of course, like a good many others, we went to extremes, so we cut out the truck garden and went into farming and raising corn and cotton and things like that. There was no trouble before this railroad dug the drainage, not at all, because there was a natural drainage of its own through there. It seems like the way that land lays. I drew that map to-day at noon. I didn't know I would need it. It is correct. * * * Father was always in the habit, when he put that fence up, he was always in the habit of leaving his fence back up so he could drive around; father says, if anybody else buys there, let them build his own fence, then we won't have any dispute about a partition fence; therefore, he left his fence back, I suppose, from the center of the railroad about 30 feet. Then the railroad company goes to work and starts ditching and the party on the place phoned me; he says, 'Mr. Schelling,' he says, 'you know the

railroad company is cutting a ditch on your land.' I says, 'Where at?' He says, 'They start at Street's switch.' G. C. Street has got a switch right in there at the edge of our land. The switch comes across this way, that right, right at the edge of our land, they started pulling there and going out next to our fence; they pulled it up and filled that old ditch up and took this dirt away from next to the fence and throwed it up and filled that ditch up. Then I spoke to my brother; he says, 'Well, I will have to look into it.' We got Judge Meek and he says, 'It's all right now; I have stopped it; I have got an injunction out against it.' At the same time I had this party, I rang him up a day or two afterwards. This dotted line, this is the old ditch, this is the natural drainage, comes down here to a big gulley. It goes on and drains into Brays bayou; in place of leaving this water right through here they cut out the new ditch along close to the edge of the railroad. The ditch by the railroad was cut by the railroad too. Then the railroad cut this ditch across through here, till they got past our line, or just about our line, then they jumped away from the railroad entirely across the county road and goes over on the north side of the county road and goes on down till they hit what they call the Telephone road; that is the Telephone road here; and brings the water around here into Brays bayou. This land belongs to Ernest, Henry, Lena, and the widow of my brother, and myself. That's five of us. My intention of using my piece of property out there is making it a home; when my children get old enough that they can get out of school, I expect to make that my home for this reason, it is nicely located, just a short distance from the city and it always has been our home, and it is a nice neighborhood; everybody around there owns their own property; there is no rental property outside of there; of course at present we are renting ours, I'll admit, because we are all away from there in town, of course. I have lived there and been familiar with that country ever since I was a boy. I do not know anything about the sale right across the road from me. The strip that they are taking is correctly reflected on the map there. That is, on the front close to the shell road. In fact it is on the shell road; right on the shell road. Immediately north of the railroad track there is a county road that goes through our land. The greater part of my land lies on what we call the east side, towards Galveston. That is where my improvements are. * * * That is land that I have never tried to improve at all, held it in its present state. The timber is still there. The portion that the railroad wants takes off a part of the timber land and also a part of the prairie land. This land has not been on the market for sale as long as we owned it. I heard of offers and have heard of sales in that neighborhood. I have heard of only one in that neighborhood. That is one that is back a little bit further down on the Telephone road from us; belongs to the Dick Lee place; the old Dick Lee place. * * * I know what that sold for. As near as I can recall, that must have been about three years ago. Something in that neighborhood; maybe a little longer than that. I do not know of any other sale within three years within this particular neighborhood aside from the one that I mentioned. Having lived there all of my life and having known of this sale up the track there further out from me, I feel that I am qualified to say what my land is worth. I am handling the property now, and have been for five or six years, I think; something in that neighborhood. I have been leasing it; renting it for residential and farm purposes. I think that I am qualified to express an opinion as to what the land is worth."

H. F. Schelling, defendant, testified:

"I am one of the defendants in this suit. I own an interest in this land. My land is not for sale. It has never been for sale. I intend to use my land for a home. [It was agreed that this witness' qualifications are the same as those of August Schelling as to value.] I was raised there. I was born in Harrisburg. I was about two years old when I moved onto this land. I do not know of any sales that have taken place around near in this neighborhood, of land. I feel, from having lived in that neighborhood and been raised there, that I am qualified to speak as to what the land is worth. In my boyhood, I farmed on that land; raised corn, cotton, and potatoes. I live in town at present and am in the blacksmith business. I have been in town since I was 21. I am now 37 years of age. I have visited this land and neighborhood, since I have been running my business here in town, two or three times a year."

Ernest G. Schelling, defendant, testified:

"I am one of the defendants in this suit. I own a portion of this Schelling tract of land. I own two interests. I expect to live on that land as a home. I lived there, well, I don't know just exactly, about 32 years. I do not know of any sales that have taken place around there in the last few years. I have been away from home about 16 years. I have been living in Houston since then. I have a home here in Houston now. I have a family. I have three children and a wife. I am in the grocery and meat business. This land is not for sale at all."

The above is the defendants' testimony.

J. M. Frost, one of plaintiff's witnesses, testified:

"I live in Houston. I am in the real estate business here in Houston. We handle city lots, suburban acreage, farms, wild lands. In my business I have made a study of the value of lands in Harris county. There are some sections of Harris county that I wouldn't say that I am familiar with the values of lands. I think I know the values in the section around where this Schelling land is located. I know where this Schelling land is located. I have inspected it; I have walked along the right of way. I know where this 18-foot strip that the railroad company is seeking to condemn is situated. The reasonable market value of that strip of land would be $400 an acre. I don't think the balance of the tract of land would be damaged at all by the taking of this 18 feet. I have sold land out in that neighborhood; the Bering land. That is on the Telephone road this side about possibly half a mile; that is, half a mile right straight through this Schelling land. That sale was made about three years ago, I should imagine. * * *"

W. J. Matthews, chief draftsman in the right of way department of the Sunset-Central Lines, testified:

"I am familiar with this tract of land that the railroad company seeks to condemn. I have a map or plat showing the location of that. That is the track, the Harrisburg branch, that is on the south side and this is on the north. The property sought to be condemned is marked on the map in yellow. The Schelling property is on the south side of the Galveston, Harrisburg & San Antonio Railroad; here's north; it is southeast. The southeast line of the tract sought to be condemned is 36 feet from the center line of the track, and the north line averages 18 feet. It extends an average distance of 18 feet from the center of the railroad. The width of this tract sought to be condemned is 18 feet, varying from 17.6 feet to 17.8 feet. The property is not entirely enclosed by a fence, there is a fence on the south line of the property to be condemned; there is no fence between this property and the track. There is a

fence on the south side. I couldn't say who built the fence. This is west of the track in question or towards Stella. The present fence on the south line of the property sought to be condemned is on line with the fence west. Towards east it is not a line. This 18 feet is used by the railroad company at present for drainage purposes principally. There is a ditch on this 18 feet, built by the Galveston, Harrisburg & San Antonio Railway Company. That ditch was constructed for the purpose of draining the right of way. There is .44 of an acre involved in this suit; less than a half an acre. This strip of land is no part of the land upon which the railroad track is laid. It is a strip of land 18 feet wide and a little over and 1000 feet long, extending parallel with the railroad track and about 18 feet from it. This map is a correct delineation showing this tract of land and the location of the different surveys there and of the railroad track."

On cross-examination, he testified:

"It is not contemplated that I know of that we are going to build tracks along here. I don't know that. I did not testify in this case before the commissioners. I have been connected with the road seven years. Prior to the time we put the ditch along where it is now, our ditch was practically 18 feet from the center of our roadbed. We filled that ditch and moved over 18 feet further. We operated our train there with that other ditch for at least seven or eight years; but the ditch didn't operate. It carried off some of the water. It was not in operation for the full purposes it was intended for, because it didn't carry off enough. We didn't make it larger because we didn't have enough land. Our old ditch was 18 feet from the center of our track. Giving 2½ feet from the center of the track to the end of the ties, that would put the ditch 15 feet from the end of the ties. We couldn't make a ditch like that carry off this water. As I stated, it hasn't been carrying it off sufficiently. I couldn't say whether these Schellings have been living out there and farming and cultivating that place for the last 20 years; I don't know. Plum gulley must be up here. This is Mr. Street's line. There is a gulley in here; whether it is Plum gulley or not, I couldn't say. I am not in a position to state that this water up in this territory used to drain down to Plum's gulley, come around here, and make its way to Bray's bayou, for the reason that I have never made any topographical survey of the adjoining property."

L. B. McDonald, superintendent of terminals, testified:

"I don't know who would be the proper man to tell you for what purpose they want the 18-foot strip that they are trying to condemn, unless it would be the right of way agent. His name is Westcott. He is in the city. His initials are M. A. None of the road from Harrisburg to Stella is double-tracked. There is a passing track from Harrisburg out to the Telephone road. There are two tracks, but we don't term those double tracks; there is the main line with an auxiliary siding, which is 4,000 feet. From the Santa Fé on we are putting dirt along the right of way at present for another passing track the same length. That track is just about a mile from the Schelling tract. At present there are about six regular freight trains per day, going and coming over that cut-off track each day. I don't remember the number of trains that passed over that track going both ways last spring at any time; that's the largest number of regular trains. I don't think there has ever been as many as 27. I am not prepared to say that hasn't on one occasion. That cut-off is not used for passenger trains. There are no stations or depots anywhere along the line between Harrisburg and Stella. That cut-off is used principally for through freight business between Houston and the West, passes in and out of Houston over that line, and not to Galveston. There are no regular trains to Galveston over that line, at all; probably one train there once a week. We have moved no tracks from Stella, from Blodgett we have."

W. I. Williamson, witness for plaintiff, testified:

"I am engaged in the real estate business in Houston. My business is mostly farm lands. I have been engaged in the business here in Houston 22 years. I am reasonably familiar with the value of lands in Harris county and particularly adjacent to the city of Houston, I think. I know the Schelling tract of land in controversy here. I have been down there to inspect this strip of land that the railroad company is seeking to condemn. I have not handled or sold any land very close to the neighborhood of this land. The nearest to the Schelling tract that I have handled is about a mile and a half or two miles from it, right up the track towards Stella, towards the junction. There was no settlement there, just on the prairie. It has been 15 years since I handled that. Since that time I haven't bought or sold any piece or know of any selling in that particular neighborhood. I know it's sold, but I haven't paid much attention to it. I only know of sales in those additions that are laid off north of there. I mean Frank Arnim's addition. That is sold by lots and blocks. I don't believe I know how that was estimated by the acre. I don't believe I remember what it sold for. From my dealings in Harris county, extending over a period of 22 years, I am able to judge by the character of land and the location of it the market value of it; that is, approximately. I can give my opinion of what would be a reasonable market value of it. As to how my opinion corresponds with the facts, it is like this: Some fellow has a piece of ground, he might ask three times what it would sell for, that won't make a market. The market is what it sells for to-day, next week or next month. I have not heard right lately of any lands being sold out in that neighborhood. In the last two years there hasn't been any business, there isn't nobody can tell hardly; it's altogether different from what it was three or four years ago; three or four years ago I could have told you within a few dollars what it would bring, but to-day there isn't anything doing in the land business, and hasn't been in two years. They are trying to hold land at prices of two or three years ago. * * * Three years ago you could sell anything you wanted to sell in a walk."

W. G. Burchfield, witness for plaintiff, testified:

"I am engaged in the real estate business in Houston. I handle subdivisions and lands. I have handled acreage property in the past. I haven't handled it lately. I know this Schelling property. I have seen this strip of land that the railroad company is endeavoring to condemn. I can't say that there has been any sales made lately, therefore, I can't say what the market value would be. I have an idea of what I think it would be worth. There has been very few sales. * * * The only way I have the knowledge is from information in the business in which I am in, from observing lands in different localities and fixing the values. * * * I am going to give you my idea of approximate valuation. I think it would be anything between $300 and $500 an acre, for this particular piece of land as near as I am willing to state. I mean this land they are asking me the value of. This is a strip of land adjoining the right of way on that Stella cut-off. When I say an acre, I mean at that rate. I went over the whole entire tract of land from one end of the strip to the other and looked at

it. I did not go back and look at the balance of the field and everything in there, but I could see over it."

A. B. Kelley, witness for plaintiff, testified:

"I am in the real estate business. * * * I deal principally in city property and lands. I handle acreage property adjoining the city of Houston. I think I am reasonably well acquainted with the market value of acreage property in Harris county. I know the tract of land that is sought to be condemned which is located down here on the Galveston, Harrisburg & San Antonio Railway, belonging to the Schellings, that we looked at the other day. I have examined the property. I think I am reasonably acquainted with the market value of lands in that immediate neighborhood. I don't know what would be the reasonable market value of this strip of land 18 feet wide and 1,000 feet long. I have never looked at it from that standpoint, of the value of other lands in that neighborhood. I appraised some about a mile the other side of it, on the railroad, some right below it there, maybe $100 or $150 an acre. That was very well drained and in much better farming condition. I think the Schelling land, right in there, would be classed more of a hardpan; I wouldn't consider it first-class farming land by any means. Back away from the road where the house is there, it looks like it is a better quality of land. I would not consider that a first class residential district. To reach the real value of that land in there per acre depends on the cost of drainage. In its present condition, I think $200 an acre would be a very outside valuation; a top price. I think the taking of the 18 feet of that land where the ditch is dug would be a benefit to the balance of the tract. That ditch would help to drain it. It would cost more to put in the ditch than the land would be worth, I should think."

We have stated heretofore practically the entire testimony of the defendants.

In the case of Cane Belt Ry. Co. v. Hughes, 31 Tex. Civ. App. 565, 72 S. W. 1020, the Galveston Court of Civil Appeals, speaking through Judge Gill, used the following language:

"This proceeding was instituted by appellant against the appellees to condemn for depot purposes lot No. 3 and the west half of lot No. 2 in block 7 of the town of Matagorda, in Matagorda county, Tex. On a hearing before commissioners appointed for the purpose, appellees were awarded damages in the sum of $500. On appeal by them to the county court they recovered $825, and were awarded the right to move their improvements. From this judgment the railway company has appealed to this court, and, as cause for reversal, has assigned errors on the admission of testimony, the amount of the judgment, and the verdict awarding the right to remove the improvements. Over the objection of the company, the court admitted testimony to the effect that the company owned other property adjacent, which was equally as suitable for depot purposes as the property condemned, and this is assailed as error. The evidence adduced did not present the issue of the right to condemn. That was shown beyond dispute, and the court, so holding, did not submit the issue to the jury. The evidence complained of could not have lawfully affected the issue, for it is well settled that as to what land a railway company may select for its right of way and depot grounds the discretion of the company is absolute, and will not be revised by the courts. In the proper construction of railways and their necessary appurtenances, the public have a large interest, and for this reason the power of eminent domain is conferred.

198 S.W.—65

If different courts and juries were allowed to pass on the necessity or advisability of condemning each tract out of the many which go to make up a right of way for a railway line, straight courses from point to point, with the consequent lessening of mileage, would in many, if not all, cases be impossible to secure. So in the case of depot grounds. One jury might hold, on competent evidence, that the land in question was not necessary to the purposes of the railroad. Another might render a like verdict as to any other tract sought to be subjected to its uses, and by such a course the company could be excluded altogether. So the rule is that the company, having shown its corporate existence, and a purpose to use the land for corporate purposes, may have its decree of condemnation, subject to the payment of the market value of the property taken, and incidental damages when less than the whole tract is taken. In this case the whole of defendants' holdings are condemned, and the sole issue for the jury to determine was the market value of the property. The evidence complained of could have no legal bearing upon that issue, and so was in no respect material. It could serve only to prejudice the jury on the issue of damages, by leading them to believe that the discretion of the agents of appellant in selecting this lot for their uses was capriciously or vindictively exercised. The court erred also in permitting Woodford Hughes to testify that the place was the homestead of himself and wife, and had been such for many years, and for that reason had a peculiar value to him. The place was shown to have a market value capable of ascertainment, and its sentimental value as an old homestead was not an element proper for the consideration of the jury. The right thus to forcefully appropriate an old homestead, surrounded, doubtless, by hallowed memories and associations, is a hard doctrine, and one against which the ordinary mind naturally rebels as an outrage upon private right; but it is none the less the law, and is founded upon public necessity. The measure of the citizen's damage when his rights are thus invaded is fixed and determined by law on the basis of value, and all elements of sentiment are excluded. The verdict of the jury on the issue of value is not beyond criticism, in view of the testimony properly admitted, and when to this is added the further feature of the verdict, awarding to defendants their improvements, which had neither been prayed for in the pleadings, nor submitted as an issue by the trial judge, it becomes manifest that the improper testimony had its effect, and that the order of the trial judge to withdraw it by charges was unavailing."

[1-3] So, it might be said in the instant case, the verdict of the jury on the issue of value is not only beyond criticism, in view of the testimony properly admitted, however, when added the further feature of the larger portion of the testimony, which was freighted with fond remembrance of the elder Schelling, and the hope that in his declining years and when the frosts of winter had silvered his head, he and his children would gather around the fireside in the old home place, and these matters were stressed in the testimony of the defendants, but upon no other cause, apparently or at least it may have been one of the principal reasons to account for the verdict that is apparently excessive, in favor of the appellee in this case.

Our attention has also been called to the case of City of Decatur v. Vaughan, 233 Ill. 50, 84 N. E. 50, which holds that in a pro-

ceeding by a city to condemn land for a street, evidence that the ·land sought to be taken had a special value to the owners because of the relationship of the owners, and because the lands were adjoining lots in a residence section of the city, and specially suitable for the location of a family settlement, was properly excluded. Also in the case of Pinkham v. Chelmsford, 109 Mass. 225, it was held squarely that in assessing damages for land taken by a town for public uses, evidence of what the owner intended to do with the land is inadmissible. So, also, Lewis on Eminent Domain, page 1240, uses the following language:

"Proof must be limited to showing the present condition of the property and the uses to which it is naturally adapted. It is not competent for the owner to show to what use he intended to put the property, nor what plans he had for its improvement, nor the probable future use of the property. Nothing can be allowed for damages to an intended use. In a proceeding to condemn a right of way through a large tract of ground belonging to an electric railroad company, the latter claimed that its purpose was to develop the tract as a park to be used in connection with its railroad, that it intended to construct a hotel, casino, ball ground, golf links, and other improvements, costing many thousands of dollars, that the value of the tract for such uses would be destroyed, and that the tract should be treated as a park and not as mere vacant land. But the court ruled that these considerations were too remote and speculative."

We believe the courts are correct in holding that the testimony would be inadmissible, and the first assignment of error is sustained. This testimony was exceedingly prejudicial, because on no other theory, as reflected by this record, the verdict assessing the actual value of the land taken, which was perhaps nearly half an acre, to be $220, over which ground there had been in operation a railroad in use for perhaps half a century, and which had already been burdened with an easement of the railroad, which was being operated daily, and the fact that a strip of ground adjoining and only 17 or 18 feet distant was sought to be condemned for the railroad either, as testified by some of the witnesses, for drainage purposes, or for any other purposes reasonably apparent in the record, it would seem that this additional burden, if additional burden it might be called, upon the land would not affect the remainder of the 36-acre tract to the extent which the jury, by their verdict, seemed to indicate. The testimony, therefore, of August Schelling, Ernest G. Schelling, and H. F. Schelling, to the effect that they were born and raised on the place is likewise prejudicial, and could serve no useful purpose, save and except the obvious purpose for which this testimony was introduced, to appeal to the sympathy of the jury, and therefore it should not have been admitted in evidence; also the testimony of Bob Tuffly, to the effect of the length of time that the property in question had been occupied as a home, should not have been admitted.

The same should be said of the fourth assignment, and in our judgment the testimony of these people should have been stricken out of the evidence. In other words, we hold that the fact that the homestead was not then being used as a homestead, but was being rented, but that it was expected and intended by the parties that in their late years it would be used as a homestead—all these matters should not have been admitted, but having been admitted should have been stricken out of the evidence by the court. The assignments therefore are sustained.

[4] The fifth assignment of error complains as follows:

"The court erred in permitting the witness Bob Tuffly to testify to the damage done to the remaining tract of land by the taking of the 18-foot strip, for the reason that the said witness was not qualified to give his opinion of this damage, which is more fully shown by bill of exception No. 6."

The witness Tuffly's testimony has been reproduced in this opinion, and is to the effect that he was a farmer; that he was not qualified to testify as to the value for the reason that he lived a mile and a half away from the property in question, did not pretend to be a real estate expert, etc., and further testified that he had not bought or sold any land in that neighborhood; that it was true he had bought 640 acres of land about six years ago, and sold it again, but that was the extent of his buying and selling. We feel that this assignment must be sustained. The facts stated by Tuffly did not qualify him to give his estimate.

[5] The sixth assignment complains as follows:

"The court erred in permitting the witness A. Yantz to testify to the damage done to the remaining tract of land by the taking of the 18-foot strip, for the reason that the said witness was not qualified to give his opinion of this damage, which is more fully shown by bill of exception No. 9."

Yantz testified that he had only bought and sold property in that neighborhood three times; that he was not in the real estate business, but in the park business; that he had bought his own place between four and five years ago. His testimony has been heretofore set out in full, and among other things he stated that while he was acquainted with values of land in that neighborhood, he stated further:

"I am now in the park business. I have bought and sold lands myself. Thirty years ago I bought that park, and then the city came too close to me, and then about 20 years ago, 18 years ago, I bought another place, and now I am on the track. I bought this present place up there near Schelling's four years ago. * * * I bought this last tract between four and five years ago. * * * I know the value of lands in that neighborhood. I know of all the sales that's been made right there. I have always lived in that neighborhood. I have heard the sales discussed there in that neighborhood; heard prices offered, and seen people refuse. I feel able to give this court and this jury my opinion as to the value. In my opinion it is worth $600 per acre. The track runs 75 feet from my land. There's a county road between

me and the track. I am on the offside of the track. Schelling is on one side, and I am on the other side of the track. I know where they proposed to take this 18 feet off down there. In my judgment, if those 18 feet are taken off there for railroad purposes, it will injure the balance of the tract of land for homestead purposes; lessen its value. In my judgment, to take off this 18-foot strip and devote it to railroad purposes and uses, or any purposes that they see fit to use it, that will decrease the value of the balance of the property over half."

This man, it seems, ran a little beer joint and amusement park. He certainly wasn't an expert and didn't pretend to be; simply an ordinary man in his business. We believe it was error on the part of the court to permit this witness to testify with reference to the value of the land, and therefore we sustain this assignment.

The seventh assignment challenges the action of the lower court in admitting in evidence, over the objection of plaintiff, testimony of the witnesses William Olschewske and J. M. Frost, Jr., on cross-examination respecting the sales of other property located at various places from a mile to three miles from the property in question; said evidence being wholly immaterial, irrelevant, and prejudicial.

The bill of exceptions shows that the court permitted Olschewske to testify on cross-examination to prospective sales in a mile and a half from the property in question, and not of the same class or kind of property as the property in controversy in this cause. The objection to the testimony was upon the ground that the property in question being shown to have a market value, and various witnesses having testified to its value, that the giving in evidence of the amounts of these various sales could not throw any proper light upon the value of the land in question; therefore the testimony was immaterial, irrelevant and prejudicial.

We are inclined to believe that this testimony should not have been admitted. However, as this case must be reversed and remanded for errors heretofore pointed out, we refrain from directly deciding this proposition, believing that upon another trial of the case, the testimony will be confined to proper issues.

[6] The railroad has been built through this property a number of years, and was simply widening the right of way to the extent of 17 or 18 feet. The jury found that the property was only worth about $500 an acre. The verdict of the jury, giving $900 as damages to the balance of the tract, judging from the testimony in this record, shows, in our opinion, passion or prejudice to the extent that the appellant was justly warranted in complaining of the same, and in the eighth assignment of error, they have challenged the action of the court below in not granting a new trial, for the reason that the verdict of the jury, in respect to the damages to the land, is grossly excessive and plainly shows passion and prejudice, and that the jury went counter to the instructions of the court, and perhaps overlooked the fact that the railroad was not being built for the first time through the land in question.

As stated above, this cause will have to be again tried by the lower court, and upon proper testimony and the omission of improper testimony, the jury will, in our opinion, on another trial return a just and fair judgment of the value of the land, and fair value of the damage to the remaining 36 acres of land in controversy in this suit. There is no complaint that the jury failed to find a just and fair amount with reference to the amount of land sought to be condemned, but the complaint is based solely upon the ground that the widening of the right of way 17 or 18 feet along the roadbed that has existed for the past 50 years, would not be such an injury to the 36 acres of land as would have been the building of a railroad along or by or near the entire 36 acres of land. As said before, we believe that the jury, upon the same or a similar charge of the court as presented in this cause, will, upon a new trial of this case, and the elimination of any sentimental value, arrive at a true and correct value of the damage to the remainder of the 36-acre tract, not by entering the fields of speculation and inquiring what might or might not be the feeling or the desire of the present owners of the premises to occupy it at some future time for homestead purposes.

Believing as we do, the case is reversed and remanded for a new trial.

HIGHTOWER, C. J., concurs in the result reached.

